UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
UNI-SYSTEMS, LLC,

                *Plaintiff*,

     v.

UNITED STATES TENNIS ASSOCIATION
NATIONAL TENNIS CENTER INCORPORATED,
ROSSETTI INC., MATTHEW L. ROSSETTI
ARCHITECT, P.C., HUNT CONSTRUCTION
GROUP, INC., HARDESTY & HANOVER, LLC,
HARDESTY & HANOVER, LLP, MORGAN
ENGINEERING SYSTEMS, INC., MORGAN
KINETIC STRUCTURES, INC., MORGAN
AUTOMATION, INC., and GEIGER GOSSEN
CAMPBELL ENGINEERS, P.C., DBA GEIGER
ENGINEERS,

                *Defendants*.
------------------------------------X

**MEMORANDUM & ORDER**

17-CV-147(KAM)(CLP)

**KIYO A. MATSUMOTO, United States District Judge:**

        Plaintiff Uni-Systems, LLC ("Uni-Systems") brings this action against Defendants United States Tennis Association National Tennis Center ("USTA"), Rossetti Inc. and Matthew L. Rossetti Architect, P.C. ("Rossetti P.C.") (collectively, "Rossetti"), Hunt Construction Group, Inc. ("Hunt"), Hardesty & Hanover, LLC and Hardesty & Hanover, LLP (collectively, "Hardesty & Hanover"), Morgan Engineering Systems, Inc. ("Morgan Engineering") and its subsidiaries, Morgan Kinetic Structures, Inc. ("Morgan Kinetic"), and Morgan Automation, Inc. ("Morgan Automation") (collectively, "Morgan"), and Geiger Campbell Engineers, P.C., ("Geiger") (collectively, "Defendants"),

alleging patent infringement and trade secret appropriation in connection with Defendants' design, manufacture, and operation of the retractable roofs at the Arthur Ashe Stadium (the "Ashe Retractable Roof") and the Louis Armstrong Stadium (the "Armstrong Retractable Roof") in Queens, New York.

Pending before the Court are the renewed motions of Rossetti and Morgan to dismiss this action for improper venue pursuant to Rule 12(b)(3) of the Federal Rules of Civil Procedure (the "Rules") or, in the alternative, to transfer this action to the districts in which each group resides in the interests of justice pursuant to 28 U.S.C. § 1406(a).  This court, by order dated October 5, 2018, had ruled that venue was improper as to the claims against Rossetti and Morgan and granted leave to replead after venue-focused discovery.  (ECF No. 265, Memorandum & Order ("M&O").)  Both Rossetti and Morgan again argue that venue is improper in this district under 28 U.S.C. § 1400(b), the exclusive patent venue statute, because neither defendant "reside[s]" or has a "regular and established place of business" in this judicial district.  For the reasons set forth below, the Court hereby GRANTS both motions and transfers Uni-Systems' claims to the appropriate venues.

### Background[1]

### I.    The Alleged Infringement

Uni-Systems describes itself as the "leading designer of retractable roof systems in the United States" and has designed and implemented retractable roof systems for major stadiums across the country, including Minute Maid Ballpark and Reliant Stadium in Houston, Texas; Marlins Ballpark in Miami, Florida; Lucas Oil Stadium in Indianapolis, Indiana; Cowboys Stadium near Dallas, Texas; and University of Phoenix (Cardinals) Stadium in Glendale, Arizona.  (ECF No. 325, Second Amended Complaint ("SAC"), ¶ 18.)  In connection with its retractable roof designs, Uni-Systems developed valuable intellectual property, including U.S. Patent Nos. 6,789,360 ("the Retention Mechanism patent") and 7,594,360 ("the Lateral Release patent"), and trade secrets in nine categories.  (*Id.* ¶¶ 19-36.)

Around 2011, Uni-Systems learned that USTA planned to construct a retractable roof over the Arthur Ashe Stadium at the USTA Billie Jean King National Tennis Center in Flushing, Queens (the "NTC").  (*Id.* ¶ 78.)  USTA hired Hunt to serve as the project design-builder.  (*Id.* ¶ 79.)  As the design-builder, Hunt contracted with Rossetti P.C., for design activities and

---

[1] The following facts are taken from Uni-Systems' Second Amended Complaint, the parties' motion papers, and the exhibits thereto.

responsibilities. (*Id.* ¶ 80.) Rossetti P.C. served as the official project architect and worked with Rossetti Inc. to provide design and architectural services. (*Id.*) Hunt contracted with Morgan Kinetic, a division of Morgan Engineering, to supply roof mechanism design and construction services for the project. (*Id.* ¶ 81.) Morgan Engineering subcontracted with Hunt to provide design-build services to engineer and fabricate the retractable roof. (*Id.*) Uni-Systems alleges the Ashe Retractable Roof infringes on its Retention Mechanism and Lateral Release patents. (*Id.* ¶¶ 92-96.)

Uni-Systems later learned that USTA had hired Hunt to serve as the construction manager responsible for construction of a retractable roof over the Louis Armstrong Stadium at the NTC. (*Id.* ¶¶ 97-98.) The defendants reprised almost identical roles to those played in constructing the Ashe Retractable roof. Rossetti P.C. served as the project architect and worked with Rossetti Inc. in connection with designing the Armstrong Retractable Roof. (*Id.* ¶ 99.) Morgan Kinetic provided construction and electrical design services for the project, subcontracting the former to Morgan Engineering and the latter to Morgan Automation. (*Id.* ¶ 100.) Uni-Systems alleges that the Armstrong Retractable Roof infringes on its Lateral Release patent. (*Id.* ¶¶ 109-11.)

4

## II.  The Alleged Infringers

Whether venue in the Eastern District of New York as to Rossetti and Morgan is proper turns on whether either has a "regular and established place of business" in this district. The following summarizes the facts relevant to this inquiry.

a. Rossetti

Rossetti Inc. is an architectural firm incorporated in Michigan with its place of business at 160 West Fort Street in Detroit, Michigan.  (ECF No. 345-3, Decl. of David Richards ("Richards Decl."), ¶ 4.)  Rossetti P.C. is a New York corporation with a registered address at 1359 Broadway in Manhattan, which it uses to receive service of process and limited mail.  (*Id.* ¶¶ 8-9.)  Rossetti P.C. was formed to comply with New York's requirement that an architect of record in an in-state project be registered in the state.  (*Id.* ¶¶ 11-12.) Rossetti P.C. has no employees of its own, shares a physical space with Rossetti Inc., and delegates its architectural work to employees of Rossetti Inc.  (*Id.* ¶¶ 8, 15.)

Rossetti's relationship with USTA began in 1990 with its design of the Arthur Ashe Stadium.  (ECF No. 348-1, Rossetti 30(b)(6) Deposition Transcript ("Rossetti Dep."), at 13:10-15.) After completion of the Arthur Ashe Stadium in 1997, Rossetti served as the architect for the USTA's renovation of the Louis

Armstrong Stadium from 1997 to 1998.  (*Id.* at 36:01-02.)
Rossetti continued to work with USTA on other projects from at
least 2000 through 2012, assisting in, *inter alia*, the
development of a master plan for the NTC.  (*Id.* at 46:01-08,
48:08-18.)  Rossetti sent employees to the NTC during this
period for meetings.  (*Id.* at 48:08-18, 51:12-22.)

More recently, since 2011, Rossetti has participated
in roughly a dozen projects[2] at the NTC, including the Ashe
Retractable Roof (2013-2016) and the Armstrong Retractable Roof
(2016-2018).  (ECF No. 348-2, Rossetti's Second Supplemental
Responses to Uni-Systems' First Set of Individual
Interrogatories ("2nd Supp. Responses"), at 9-11.)  Rossetti
generally provided architectural services for projects in six
phases: (1) Programming; (2) Concept Development; (3) Schematic
Design; (4) Design Development; (5) Construction Documents; and
(6) Construction Administration.  (Rossetti Dep. at 14:11-15:01;
16:13-22; 19:06-12; 23:17-24:03; 26:01-06; 27:07-16; 37:22-24,
80:04-25.)  Rossetti's work on its projects for NTC between 2011

---

[2] Rossetti's supplemental responses to Uni-Systems' interrogatories, dated
December 20, 2018, indicated its involvement in a number of smaller projects
for USTA in the same time frame: Heineken Café (Jan. 10, 2011 to Jan. 24,
2013); West Courts Renovation (Mar. 26, 2013 to May 3, 2016); Grandstand
Stadium Renovations (July 19, 2013 to Jan. 26, 2018); South Courts
Renovations (July 16, 2013 to July 24, 2018); Mercedes Café (Feb. 17, 2016 to
Nov. 29, 2017); Champions Restaurant (June 19, 2016 to Oct. 4, 2017); Suite
Pantry (July 9, 2016 to July 12, 2017); Broadcast Stadium Building (Mar. 9,
2017 to "present"); and Players' Locker Room Renovations (Apr. 5, 2017 to
Aug. 21, 2018).  (2nd Supp. Responses, at 9-11.)

and 2018, except local meetings and field services during construction, was performed in Rossetti's Detroit, Michigan facility by Rossetti's employees in Detroit.  (Richards Decl. ¶ 5.)

Rossetti was required to send employees from Detroit to visit the NTC for certain portions of its work.  (*See id.*; Rossetti Dep. at 82:12-15; ECF No. 348-3, Master Services Agreement ("Ashe Agreement (USTA-Rossetti)"), Ex. 8, § V(d); ECF No. 348-4, Professional Services Agreement ("Armstrong Agreement (Hunt-Rossetti)"), Art. 1.12.4.2; ECF No. 345-5, Master Services Agreement ("Armstrong Agreement (USTA-Rossetti)"), Ex. B.) Rossetti employees traveled to the NTC for on-site meetings during the concept development phase (*see* Rossetti Dep. at 17:08-11) and visited the construction sites to observe construction during the construction administration phase (*see id.* at 32:03-08) of its projects.  In practice, Rossetti's attendance during the construction administration phase of its projects varied, ranging from once every two weeks to several days a week, at the end of the phase.  (Rossetti Dep. at 36:14-37:17, 39:02-40:12.)  On average, during the period between 2011 and 2018, a Rossetti employee traveled to the Eastern District of New York once every two weeks.  (2nd Supp. Responses, at 8.) To facilitate visits, Rossetti was granted reasonable access to

the project sites.  (Ashe Agreement (USTA-Rossetti), Ex. A §
V(f), 19; Armstrong Agreement (USTA-Rossetti), Ex. B.1, 23–24.)

       In addition to having to attend on-site meetings and
observe construction, as detailed above, Rossetti had other
responsibilities, which occurred primarily during the
construction administration phase of its projects.  Rossetti
reviewed trade submittals, which are documents or samples,
created based on Rossetti's designs, of the actual materials to
be used in a project.  (Rossetti Dep. at 28:06–29:02.)  Rossetti
reviewed the submittals to confirm they matched the design's
scope and intent.  (*Id.*)  Rossetti's 30(b)(6) witness testified
that although it may not be "wise" to proceed without Rossetti's
approval of a trade submittal, Rossetti "[could not] prevent
someone from proceeding."  (*Id.* at 29:06–29:11.)  Rossetti
responded to requests for information, which were generally
requests for interpretations of Rossetti's construction
documents.  (*Id.* at 30:02–25.)  Rossetti also reviewed and
certified requests for progress payments, which entailed
Rossetti confirming, based on its observations, that certain
work was completed and should be paid for.  (*Id.* at 31:01–21.)
(*See also generally* Armstrong Agreement (Hunt-Rossetti), Art.
1.12.4; Armstrong Agreement (USTA-Rossetti, Ex. B.1, 23–24.)
Review of trade submittals and requests for information occurred
in Detroit.  (Rossetti Dep. at 82:19–20.)

b. <u>Morgan</u>

Morgan Engineering is an engineering company incorporated in Ohio.  (ECF No. 346-2, Declaration of Mark Fedor ("Fedor Decl."), ¶ 6.)  Morgan Automation and Morgan Kinetic, both subsidiaries of Morgan Engineering, are also incorporated in Ohio.  (*Id.* ¶¶ 5-6.)  All Morgan entities have their principal place of business in Alliance, Ohio.  (*Id.* ¶ 7.)

Morgan contracted with Hunt to provide services related to the roof mechanizations for the Ashe and Armstrong Stadiums on March 20, 2014 and October 17, 2016, respectively. (ECF No. 348-6, Professional Services Agreement ("Ashe Agreement (Hunt-Morgan)"); ECF No. 348-7, Professional Services Agreement ("Armstrong Agreement (Hunt-Morgan)").)  Morgan's role entailed designing aspects of the roofs and building mechanization components.  (ECF No. 346-1, Decl. of Brian Mertes, Esq., Ex. A, Morgan 30(b)(6) Deposition Transcript ("Morgan Dep."), at 14:01-15:03, 33:08-34:08.)  Morgan provided its design and construction services in five phases: (1) Pre-Design; (2) Engineering and Manufacturing; (3) Erection; (4) Electrical; and (5) U.S. Open Preparation.  (*See id.* at 107:10-14.)  Morgan completed the design and manufacture of the moving parts for the roofs in Ohio.  (Opp. at 6.)

Morgan sent employees to the NTC to perform its obligations under the agreements.  (Morgan Dep. at 126:09-25;

127:16-20.)  Morgan employees visited the NTC for meetings
during the pre-design phase (*id.* at 66:11-24; ECF No. 347, Uni-
Systems Opp. ("Opp."), at 6 (citing Ashe Agreement (Hunt-
Morgan), § 3.5; Armstrong Agreement (Hunt-Morgan), § 3.5)); to
provide on-site technical representation and inspection during
the erection phase (Morgan Dep. at 67:15-69:22, 80:19-81:01;
Opp. at 6 (citing Ashe Agreement (Hunt-Morgan), §§ 9.5, 13.1;
Armstrong Agreement (Hunt-Morgan), §§ 9.5, 13.1)); to supervise
electrical contractors during the electrical phase, (Morgan Dep.
at 50:09-51:23); and to test the function of each retractable
roof, on two "move" days for Ashe and five "move" days for
Armstrong, at the U.S. Open Preparation Stage (*id.* at 44:09-
46:14; 118:12-14).  Morgan had some responsibility for
maintaining safety on the sites during the Erection Phase.
(Opp. at 6 (citing Ashe Agreement (Hunt-Morgan), §§ 25.1- 25.4;
Armstrong Agreement (Hunt-Morgan), §§ 25.1-25.4).)  The
Armstrong project ended for Morgan in June 2018.  (Morgan Dep.
at 53:25-54:03.)  Morgan estimates its employees visited the NTC
roughly 60 times between March 2014 and June 2018.  (*Id.* at
126:04-08.)

On August 14, 2017, Morgan entered into a subcontract
which obligated it to conduct periodic maintenance of the roof.
(*Id.* at 54:15-18; Opp. at 7-8 (citing ECF No. 348-9, Maintenance
Agreement ("Subcontract Agreement (H&H-Morgan)").)  The

subcontract requires that Morgan conduct quarterly maintenance of the roofs and test and maintain the roofs for the two weeks prior to and during the U.S. Open each year.  (Maintenance Agreement (H&H-Morgan), Ex. C.)[3]

### **Procedural History**

On November 11, 2017, Uni-Systems filed this patent infringement and trade secret misappropriation action.  (ECF No. 1, Compl.)  The complaint asserted two counts of patent infringement against, *inter alia*, Rossetti Inc. and Morgan Engineering.  (*Id.* ¶¶ 57-84.)  Rossetti Inc. and Morgan Engineering answered the complaint and counterclaimed for declaratory judgments of invalidity and noninfringement.  (ECF No. 55, Ans. (Morgan); ECF No. 58, Ans. (Rossetti).)  Both indicated in their answers that they did not contest that venue in this district was appropriate for purposes of this action. (Ans. (Morgan); Ans. (Rossetti).)

### **I.   First Motion to Dismiss for Improper Venue**

On May 22, 2017, the United States Supreme Court issued its decision in *TC Heartland LLC v. Kraft Foods Group*

---

[3] Morgan agreed to venue in this district under its contracts with Hunt and Hardesty & Hanover.  (Opp. at 5, 7 (citing Ashe Agreement (Hunt-Morgan), § 34.3; Armstrong Agreement (Hunt-Morgan), § 34.3; Subcontract Agreement (Hardesty & Hanover-Morgan), Ex. 1 § 1.37); Morgan Rep. at 1-2.)  Uni-Systems does not allege that it can enforce these provisions and cites them only as evidence that Morgan viewed this district as a "logical, fair, and convenient venue for any suit arising out of its work at the NTC Campus."  (Opp. at 23.)

*Brands LLC*, 137 S. Ct. 1514 (2017), which significantly tightened the law on patent venue.  Following *TC Heartland*, Rossetti Inc. and Morgan Engineering, relying on the change in law, requested leave to file motions to dismiss Uni-Systems' complaint for improper venue pursuant to Rule 12(b)(3).  Uni-Systems simultaneously sought leave to file an amended complaint.  Uni-Systems' proposed amended complaint set forth additional allegations as to venue, which were largely conclusory and parroted the patent venue statute.  (*See* ECF No. 151-2, Proposed First Amended Complaint, ¶ 10.)  The Court ordered that the parties file their oppositions to Uni-Systems' motion to amend, incorporating their arguments for dismissal. (ECF Dkt. Order Oct. 24, 2017.)

Rossetti Inc. and Morgan Engineering opposed Uni-Systems' motion for leave to amend and moved for dismissal, arguing, *inter alia*, that the proposed amended complaint failed to establish venue over either set of entities.  (ECF No. 187, Rossetti's Opp. & Mot.; ECF No. 200, Morgan's Opp. & Mot.)  Both argued that Uni-Systems' conclusory allegations did not meet the necessary elements of patent venue, namely, that either group of entities resided in, or had a regular and established place of business in, this district.  28 U.S.C. § 1400(b).

Uni-Systems responded that the Ashe and Armstrong construction sites qualified as the "places of business" of the

defendants, as both Rossetti and Morgan worked at those locations, and that said sites were "regular and established" places of business because the projects occurred over a five-year span.  (ECF No. 192-1, Uni-Systems' Rep. in Support of Mot. to Amend, at 21-23.)  Uni-Systems argued the entities ratified the stadia as their places of business: both Rossetti Inc. and Morgan Engineering promoted their involvement in the projects on their websites, with Rossetti Inc. further representing that it has "served as the . . . United States Tennis Association's master planner and architect since 1990."  (*Id.* at 23-25.)[4]  Uni-Systems argued these entities exercised control over the sites, a relevant consideration as to whether the sites are a "place" of the defendants, as manifested by their ability to:

> [D]irect which of their respective employees may access the site; direct and oversee their respective employees' activities while on site; keep unauthorized people out of the construction site; and otherwise exert sufficient authority over the site to ensure that the Arthur Ashe Stadium and Louis Armstrong Stadium roofs are built safely and as designed.

(*Id.* at 24-25.)

On October 5, 2018, the court issued a Memorandum & Order finding Uni-Systems' allegations and evidence insufficient to demonstrate that either Rossetti Inc. or Morgan Engineering resided in, or had a regular and established place of business

---

[4] The Court rejected Uni-Systems' additional argument that Rossetti and Morgan had waived their right to object to venue.  (M&O at 9-13.)

in, this district.  (ECF No. 265, Mem. & Order ("M&O"), at 15-
16.)  The court found that none of Uni-Systems' allegations
demonstrated that the stadia were places *of the defendants*.
(*Id.* at 16.)  The evidence demonstrated only that Rossetti Inc.
and Morgan Engineering "provided services on-site to the actual
owners of the Arthur Ashe and Louis Armstrong Stadiums."  (*Id.*
at 14.)  As Uni-Systems sought limited venue-specific discovery,
however, the Court denied the motions to dismiss for improper
venue, without prejudice, and granted Uni-Systems' leave to file
an amended complaint.  (*Id.* at 16-17.)

## II.  Second Motion to Dismiss for Improper Venue

Uni-Systems filed a First Amended Complaint (dated
October 11, 2018) (ECF No. 268, First Am. Compl.) and Second
Amended Complaint (dated December 28, 2018) (ECF No. 325, Second
Amended Complaint) in quick succession, adding Rossetti P.C.,
Morgan Kinetic, and Morgan Automation as parties.  The Second
Amended Complaint, drafted after the close of venue-related
discovery, set forth additional venue-related allegations.
Morgan and Rosetti promptly moved to dismiss the Second Amended
Complaint for improper venue under Rule 12(b)(3) or, in the
alternative, to transfer under § 1406(a).  (ECF No. 345, Rosetti
Mot. to Dismiss ("Ros. Mot."); ECF No. 346, Morgan Mot. to
Dismiss ("Mor. Mot."); Opp.; ECF No. 348, Uni-Systems Decl. in

Supp.; ECF No. 345-10, Rosetti Rep. ("Ros. Rep."); ECF No. 349,
Morgan Rep. ("Mor. Rep.").)[5]

## **Standard of Review**

When a defendant challenges venue in a patent
infringement action pursuant to Rule 12(b)(3), the plaintiff
bears the burden of showing that venue is proper.  *In re ZTE
(USA) Inc.,* 890 F.3d 1008, 1012-13 (Fed. Cir. 2018).  The
reviewing court may consider facts outside of the pleadings.
*Allied Dynamics Corp. v. Kennametal, Inc.*, 965 F. Supp. 2d 276,
287-88 (E.D.N.Y. 2013).  Unless the court holds an evidentiary
hearing,[6] the plaintiff need only make a *prima facie* showing of
venue.  *Peerless Network, Inc. v. Blitz Telecom Consulting, LLC*,
No. 17-CV-1725 (JPO), 2018 WL 1478047, at *4 (S.D.N.Y. Mar. 26,
2018) (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355

---

[5] Uni-Systems later moved to amend its complaint to re-plead induced
infringement claims against Rossetti, Geiger, Morgan, and Hardesty & Hanover,
and to include USTA and USTA NTC as parties.  (*See generally* ECF No. 383-33,
Annotated Proposed Third Amended Complaint.)  None of the proposed amendments
appear to impact the instant motion.

[6] "[I]t may be appropriate for the district court to hold an evidentiary
hearing before resolving [a] Rule 12(b)(3) motion" if there are disputed
facts relevant to the venue determination.  *Allied Dynamics*, 965 F. Supp. 2d
at 287-88 (citing *New Moon Shipping Co. v. MAN B & W Diesel A.G.*, 121 F.3d
24, 29 (2d Cir. 1997)).  Whether to hold a hearing and the scope and method
of the hearing is within the court's sound discretion.  *See id.* (citing
*Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1139 (9th Cir. 2004)).  The
Court's M&O noted that Uni-Systems requested discovery and a hearing on
venue, but it only appears to have requested the former.  (*See* ECF No. 192-1,
Uni-Systems Rep. in Supp. of Mot. to Amend, at 25-26.)  No party requested an
evidentiary hearing on venue in their proposed scheduling order for these
motions, or in their motion papers (ECF No. 339, Proposed Scheduling Order;
Rossetti Mot.; Morgan Mot.; Opp.), and as the parties do not dispute the
facts - just their implications – the Court would find one unnecessary.

(2d Cir. 2005)).  In analyzing whether the plaintiff has met this burden, courts must "view all the facts in a light most favorable to plaintiff."  *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007).

## Discussion

Rossetti and Morgan move to dismiss Uni-Systems' complaint for improper venue pursuant to Rule 12(b)(3).  Whether venue is proper in this action is governed by 28 U.S.C. § 1400(b), the "'sole and exclusive provision controlling venue in patent infringement actions.'"  *TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 137 S. Ct. 1514, 1520-21 (2017) (quoting *Fourco Glass Co. v. Transmirra Prod. Corp.*, 353 U.S. 222, 229 (1957)).  Venue is proper under § 1400(b) "in the judicial district [1] where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."  28 U.S.C. § 1400(b).  For the reasons set forth below, the court finds that venue is not proper in this district as to the movants, and Uni-Systems' claims against Rossetti and Morgan should be transferred, respectively, to the Eastern District of Michigan and the Northern District of Ohio.

## I.  Interpreting the Patent Venue Statute

In considering whether venue is appropriate under the patent venue statute, courts must be mindful that "patent venue is narrower than general venue — and intentionally so."

*Peerless Network*, 2018 WL 1478047, at *2.  "'Congress adopted the predecessor to § 1400(b) as a special venue statute in patent infringement actions to eliminate the 'abuses engendered' by previous venue provisions allowing such suits to be brought in any district in which the defendant could be served.'"  *Id.* (quoting *Schnell v. Peter Eckrich & Sons, Inc.*, 365 U.S. 260, 262 (1961)).  "The statute's 'main purpose' was to 'give original jurisdiction to the court where a permanent agency transacting the business is located.'"  *In re Cray Inc.*, 871 F.3d 1355, 1361 (Fed. Cir. 2017) (quoting 29 Cong. Rec. 1900 (1897) (statement of Rep. Lacey)).  "Jurisdiction would not be conferred by '[i]solated cases of infringement' but 'only where a permanent agency is established.'"  *Id.* (quoting 29 Cong. Rec. 1900 (1897) (statement of Rep. Lacey)).

In light of the legislative history, courts have cautioned that "[t]he provisions of § 1400(b) are not to be liberally construed."  *In re Cordis Corp.*, 769 F.2d 733, 736 (Fed. Cir. 1985).  Indeed, "[t]he requirement of venue is specific and unambiguous; it is not one of those vague principles which, in the interests of some overriding policy, is to be given a 'liberal' construction."  *Schnell*, 365 U.S. at 262 (quoting *Olberding v. Illinois Cent. R. Co.*, 346 U.S. 338, 340 (1953)).  Courts must therefore be careful not to "conflate showings that may be sufficient for other purposes, *e.g.*,

17

personal jurisdiction or the [doing business standard of the] general venue statute, with the necessary showing to establish proper venue in patent cases." *Cray*, 871 F.3d at 1361.

## II.  Timing Under the Patent Venue Statute

There is some uncertainty as to the timing for determining patent venue. *In re Google LLC*, 949 F.3d 1338, 1340 (Fed. Cir. 2020).  One group of courts holds that venue should be determined based on the facts existing at the time the action is filed, as doing so better comports which the plain language of the statute. *See, e.g.*, *NetSoc, LLC v. Chegg Inc.*, Nos. 18-cv-10262 (RA) *et al.*, 2019 WL 4857340, *2 (S.D.N.Y. 2019) (noting that venue is appropriate in a venue where a defendant "resides" or "has" a place of business).  Other courts, however, appear to have carved out a limited exception for patent cases under which venue is determined based on the facts existing at the time the cause of action accrues, if suit is filed within a reasonable time thereafter. *See, e.g.*, *San Shoe Trading Corp. v. Converse Inc.*, 649 F. Supp. 341, 345 (S.D.N.Y. 1986).  This exception is driven by a desire to prevent defendants from avoiding suit in a given venue by retreating from the district after committing acts of infringement. *See, e.g.*, *Welch Sci. Co. v. Human Eng'g Inst., Inc.*, 416 F.2d 32, 35 (7th Cir. 1969).

Rossetti argues that the earliest relevant time for determining patent venue is when the cause of action accrues.

18

(Ros. Mot. at 6.)  Rossetti dates the accrual of Uni-Systems'
causes of action against it to March 19, 2014, the date its
alleged infringement began through the provision of field
services under the Hunt contract.  (*Id.*)  Uni-Systems agrees
that venue is to be assessed when the cause of action accrues.
(Opp. at 11.)  But Uni-Systems takes issue with Rossetti's
apparent assertion that events occurring before accrual are not
relevant, arguing that the "regular and established" requirement
of the patent venue statute inherently demands a look back in
time to consider the history of the defendant's business and
conduct in a given district.  (*Id.*)  Uni-Systems may be correct,
but this dispute is immaterial, as considering the events which
occurred at the NTC prior to 2014 does not materially affect the
outcome of the instant motions.

        Morgan argues that venue should be determined based on
the facts as they exist at the time the action is commenced, but
recognizes that, in the patent context, some courts will look to
the state of facts that existed at the time the cause of action
accrued.  (Mor. Mot. at 5.)  Morgan notes, however, that neither
line of precedent considers exclusively post-filing activity in
establishing venue.  *See, e.g.*, *Omega Patents, LLC v. CalAmp
Corp.*, No. 13-cv-1950-Orl-40DCI, 2017 WL 4990654, at *3 (M.D.
Fla. Sept. 22, 2017) ("[V]enue must be determined at the time
the action is filed and not at some future date in the

19

proceedings."). As a result, Morgan asserts, and Uni-Systems disagrees, that events that occur after filing are not relevant to the venue analysis. (Mor. Mot. at 13; Opp. at 12.) Though the court agrees with those decisions holding that venue is determined based on the facts existing at the time the plaintiff commences an action, *see, e.g.*, *NetSoc*, 2019 WL 4857340, at *2, the post-filing events – namely, Morgan's maintenance contract – would not materially change the outcome of these motions.[7]

## III. Application of the Patent Venue Statute

As noted above, § 1400(b) provides for venue (1) where a defendant "resides" or (2) where a defendant has committed acts of infringement and has a regular and established place of business. 28 U.S.C. § 1400(b). Uni-Systems concedes none of the Rossetti or Morgan entities "resides" in this district.[8] It

---

[7] "In patent infringement actions, venue must be established individually as to each defendant named in the action." *Tour Tech. Software, Inc. v. RTV, Inc.*, 377 F. Supp. 3d 195, 210 (E.D.N.Y. 2019) (citing *Magnacoustics, Inc. v. Resonance Tech. Co.*, No. 97-1247, 1997 WL 592863, at *1 (Fed. Cir. Sept. 25, 1997)). Thus, the court should consider whether Uni-Systems has established venue as to *each* specific entity. But both Uni-Systems and Rossetti and Morgan refer to the defendants' collective conduct in their motion papers. In this case, however, the distinction is academic. Even assuming one entity out of each constituent group – say, Rossetti Inc. and Morgan Engineering – completed all acts described by the parties, it would still be insufficient to render venue proper in this district.

[8] For patent venue purposes, a corporate defendant resides in its state of incorporation, *TC Heartland*, 137 S. Ct. at 1521, and in a state with multiple judicial districts, resides in the single judicial district within that state where it maintains a principal place of business, or its registered office, *In re BigCommerce, Inc.*, 890 F.3d 978, 986 (Fed. Cir. 2018). Uni-Systems concedes none of the Rossetti or Morgan entities is incorporated in this district.

must, therefore, show that Rossetti and Morgan both committed acts of infringement in this district *and* had a regular and established place of business in this district.  Neither Rossetti nor Morgan challenge, for venue purposes, Uni-Systems' allegation that they infringed on its patents in this district.

Whether venue is proper thus turns on whether Rossetti or Morgan had a regular and established place of business in this district during the relevant period.  In *In re Cray*, the Federal Circuit explained that the "regular and established place of business" inquiry entails "three general requirements": (1) there must be a physical place in the district; (2) it must be a regular and established place of business; and (3) it must be the place of the defendant."  *Id.* at 1360.  "If any statutory requirement is not satisfied, venue is improper under § 1400(b)."  871 F.3d 1355.

It is important, however, to bear in mind that the *Cray* panel – after articulating the foregoing requirements – explained that "no precise rule has been laid down" to govern whether a defendant has a regular and established place of business in a district.  *Id.* at 1362.  "[E]ach case depends on its own facts."  *Id.*  The *Cray* requirements merely "inform whether there exist the necessary elements, but do no supplant the statutory language."  *Id.*  The analysis, in all cases, "must be closely tied to the language of the statute."  *Id.*

At this stage of the litigation – at which Uni-Systems need only establish a *prima facie* case for venue – the court finds that Uni-Systems has met the first element of the *Cray* test of a physical place in this district.  Uni-Systems, however, fails to satisfy the "regular and established place of business" or place "of the defendant" elements.

A. <u>Element #1: "Physical Place" in the District</u>

The first requirement is that the defendant has a physical "place" in the district.  *In re Google LLC*, 949 F.3d 1338, 1343 (Fed. Cir. 2020).  The *Cray* court, relying on the dictionary definition of "place," ruled that "[w]hile the 'place' need not be a 'fixed physical presence in the sense of a formal office or store,' there must still be a physical, geographical location in the district from which the [defendant's] business is carried out."  *Cray*, 871 F.3d at 1362. This element is satisfied by a branch office, sales showroom, or warehouse, *see, e.g.*, *San Shoe*, 649 F. Supp. at 345, a table at a flea market, *Google*, 949 F.3d at 1343, shelf in a supermarket, *Peerless Network*, 2018 WL 1478047, at *3, or even a physical data server, *Seven Networks, LLC v. Google LLC*, 315 F. Supp. 3d 933, 939 (E.D. Tex. 2018).

i. *Rossetti*

Uni-Systems points to the NTC, and more specifically, "the construction sites for the dozens of projects there for

which Rossetti was the architect," as the physical place(s) from which Rossetti's business is carried out. (SAC ¶ 12.) Rossetti argues that Uni-Systems' allegations are insufficient because Rossetti did not possess any place in the NTC, or in the Eastern District of New York, for the purpose of conducting regular or ongoing business. (Ros. Mot. at 7.)

As support, Rossetti cites *Regents of the University of Minnesota v. Gilead Sciences, Inc.*, 299 F. Supp. 3d 1034 (D. Minn. 2018). In *Regents*, the court found that the defendant did not have a physical place in the district. *Id.* at 1040-41. The court noted that "[n]one of [the defendant's] employees worked from a stand-alone business office in [the district], but instead, work in the field, visiting healthcare providers." *Id.* at 1041. The court finds the same here – none of Rossetti's employees work at a stand-alone business office in the district; instead, they simply perform work at the NTC, as needed.

Moreover, the Federal Circuit stated in *Cray* that the physical place element requires a place *from* which the business of the defendant is carried out, not merely a place *at* which its business is carried out. *Cray*, 871 F.3d at 1362. Although this may appear to be a matter of semantics, "[i]n a sense, the preposition is key" – Rossetti carried out its business *at* the construction sites, by providing the limited services described above, but it is not unreasonable to argue that Rossetti did not

carry out business *from* the NTC.  *Peerless Network*, 2018 WL 1478047, at \*4 (contrasting conducting business *from* a place with conducting business *through* equipment).  Indeed, as courts have stated, a place of business is "a location where, for example, products are made, customers are served, or business decisions are made."  *Id.*

The court, however, is inclined to agree with Uni-Systems.  Given that Rossetti was obligated to provide at least some services at the NTC, it is fair to characterize Rossetti as carrying out these on-site portions of its obligations from the NTC, or, more specifically, the construction sites located therein at the relevant time.[9]  *See, e.g.*, *Tour Tech. Software, Inc. v. RTV, Inc.*, 377 F. Supp. 3d 195, 205 (E.D.N.Y. 2019) ("Plaintiff has made a *prima facie* showing of this factor. [Defendant's] argument that it does not have a physical location in this district in part because it 'does not rent or own any property in New York' is not determinative.  The Court in *In re Cray* explained that the 'place' requirement is satisfied if there is a 'physical, geographical location in the district from which the business of the defendant is carried out.'" (citing *In re Cray*, 871 F.3d at 1362)).  Uni-Systems has, consequently,

---

[9] Uni-Systems alternates between asserting that the NTC as a whole, rather than the construction sites in particular, constitute the "place(s)" of Rossetti.  To the extent the distinction is material to the analysis, it is incorporated in the discussion below.

pointed to a place in the district from which the defendant has carried out business. Whether the place is a regular and established place of business, or can be considered one "of the defendant," is addressed in the remainder of the *Cray* analysis.

        ii. *Morgan*

        Uni-Systems identifies the NTC, and more specifically, "the construction site for Arthur Ashe Stadium and the completed structure, the construction site for the Louis Armstrong Stadium and the completed structure, and the completed control room for operating the retractable roofs," as the physical place(s) for Morgan. (SAC ¶ 14.) Morgan does not appear to contest this element but focuses instead on whether the identified place(s) are "regular and established places of business" or "of Morgan." (*See* Mor. Mot. at 7-8.) For the reasons stated above, the court finds Uni-Systems' assertions sufficient at this juncture.

    B. <u>Element #2: "Regular & Established Place of Business"</u>

        The second requirement is that the place be a "regular and established place of business." *Cray*, 871 F.3d at 1362 (emphasis added). Courts seeks to discern "whether the corporate defendant does its business in [a given] district through a permanent and continuous presence." *Cordis*, 769 F.2d at 737. There are two parts to this inquiry, considered separately – whether the defendant's place of business is "regular" and "established." *Cray*, 871 F.3d at 1362.

A business may be "regular" if it "operates in a 'steady[,] uniform[,] orderly[, and] methodical' manner." *Cray*, 871 F.3d at 1362 (quoting Whitney, *supra*, at 5050.)  Sporadic activity is not enough, nor is performing a single act in a business (though a series of such acts would qualify).  *Id.*  A business may be "established" where it is "settle[d] certainly, or fix[ed] permanently." *Cray*, 871 F.3d at 1363 (quoting *Establish*, Black's Law Dictionary (1st ed. 1891)).  A transient place or location established for a particular transaction is insufficient.  *See, e.g.*, *RegenLab USA LLC v. Estar Techs. Ltd.*, 335 F. Supp. 3d 526, 550 (S.D.N.Y. 2018) (citing *Phillips v. Baker*, 121 F.2d 752, 756 (9th Cir. 1941)).  A business can move, but the key is that the defendant be settled in the place for some meaningful period of time, not merely temporarily.  *Id.*

The Federal Circuit identified two benchmarks in *Cray* to assist district courts in determining whether a business is regular and established.  *Knapp-Monarch Co. v. Casco Prod. Corp.*, 342 F.2d 622 (7th Cir. 1965), at one end of the spectrum, found that a defendant's semiannual appearance at a trade show did not satisfy § 1400(b).  *Id.* at 625 ("Although the show itself may have been a semiannual event and thus 'regular' in that sense, Casco's participation in it constituted a temporary presence in Chicago rather than a regular and established place where one could transact business with the defendant from day to

day and from month to month.").  On the other end, *Remington Rand Bus. Serv. v. Acme Card Sys. Co.*, 71 F.2d 628 (4th Cir. 1934), found that a defendant's continuous operation of an office and salesroom in a district for five years satisfied § 1400(b).  *Id.* at 629 ("Remington . . . has operated an office and salesroom at 130 West Fayette street, Baltimore, Md., for more than five years prior to the institution of the pending suit under the supervision of a regional sales manager for the sale of products sold by the defendant.").

The Federal Circuit later provided additional guidance in *In re Google LLC*, 949 F.3d 1338.  *Google* explained that the patent venue statute must be read in light of the corresponding service statute, which presumed that a defendant would only have a "regular and established place of business" if it also had an "agent . . . engaged in conducting such business."  *Id.*  The court must, therefore, examine whether the defendant "had an employee or agent with a regular, physical presence at its 'place of business' and whether that employee or agent was conducting [its] business."  *Id.*

i. *Rossetti*

Despite an opportunity to take venue discovery, Uni-Systems has failed to show that Rossetti's purported place of business in the district is regular and established.  The court is cognizant of Uni-Systems' arguments with respect to the

27

alleged regularity of Rossetti's presence at the district.  Uni-Systems cites to testimony indicating that an employee from Rossetti visited the NTC site approximately once every two weeks or so throughout the relevant period.  Although the visits are tied to specific projects and were not necessarily orderly in nature – and, by all appearances, were more sporadic and on an as-needed basis – Rossetti can fairly be said to have a regular presence in the district.

Rossetti responds to this point not by contesting that it has a regular presence, but by asserting that the statute requires more.  What the statute requires, Rossetti says, is not just regular *presence*, but a regular *place of business*.  *See, e.g.*, *Regents*, 299 F. Supp. 3d at 1042 (finding no regular place of business despite the fact that twelve different employees from the defendant visited the district); *Lites Out, LLC v. OutdoorLink, Inc.*, No. 17-CV-00192, 2017 WL 5068348, at *2 (E.D. Tex. Nov. 2, 2017) (finding no regular place of business despite traveling out-of-state employees and contractors regularly traveling to the district to install equipment on billboards as defendant lacked a physical place of business in the district). These cases are arguably distinguishable, as here the employees of Rossetti visit a single location, but the dispute is somewhat academic, as Rossetti's business is clearly not "established" in this district.

28

*Cray* indicated that whether a business is sufficiently permanent to be "established" is separate from whether it is "regular." Yet, Uni-Systems attempts to shoehorn the same facts – the regular presence of Rossetti employees at the NTC construction sites – into an argument satisfying the established component of this requirement. In the context of this case, the presence of Rossetti employees does not render its alleged place of business "settled certainly or fixed permanently." Rossetti worked at thirteen different construction sites across the NTC campus, each of which was for a particular project and was temporary in nature.[10] None of the construction sites, by their nature, had an element of permanence to them. *See Phillips v. Baker*, 121 F.2d 752, 756 (9th Cir. 1941) ("A 'regular place of business' is, obviously, a place where such business is carried on 'regularly' and not merely temporarily, or for some special work or particular transaction."); *Winterbottom v. Casey*, 283 F. 518 (E.D. Mich. 1922). Rossetti's only regular and established place of business during the relevant period was its Detroit headquarters, and although Rossetti was regularly present in this district, it took no steps to make its presence at the NTC anything more than sporadic and temporary. *Compare, e.g.*, *Cordis*, 769 F.2d 733 (engaging a secretarial service and

---

[10] To the extent Rossetti seeks to argue that the entire NTC is the place of Rossetti, Rossetti's business at the NTC would still not be sufficiently regular or established, nor would the NTC qualify as a place "of Rossetti."

including phone number of said service as its contact
information in district).

Uni-Systems attempts to show permanence by analogizing
Rossetti's presence to the business in *Remington*, 71 F.2d 628,
which is not an apt analogue.  Rather, Rossetti's presence is,
by its nature – and without further acts to make its presence
anything more – temporary.  Rossetti's presence is more akin to
the semiannual trade sale in *Knapp*, undercutting Uni-Systems'
argument.

Uni-Systems also argues that Rossetti's contractual
relationships with the NTC lend sufficient permanence to its
presence.  Although a contract can, under the appropriate
circumstances, suggest a sufficiently established business, the
facts are critical.  Here, the contract was to provide sporadic
services for temporary projects; this sort of conduct, by its
nature, does not lend any permanence to Rossetti's business at
the NTC.  *Compare, e.g.*, *Tinnus Enterprises, LLC v. Telebrands
Corp.*, No. 17-cv-170 (RWS), 2018 WL 4560742, at *4 (E.D. Tex.
Mar. 9, 2018) (finding existence of contract relevant to
presence at leased shelves in stores sufficiently permanent
where it leased premium shelf space for several continuous
years); *In re Google LLC*, No. 2018-152, 2018 WL 5536478, at *3
(Fed. Cir. Oct. 29, 2018) (finding existence of contract

30

relevant where it ensured presence of server, the purported place of business, in fixed location for significant time).

The conclusion that Rossetti lacks an established, regular place of business in this district is bolstered by the Federal Circuit's recent decision in *In re Google*, 949 F.3d 1338 (Fed. Cir. 2020).  In *Google*, the panel explained that the patent venue and service statutes must be read together.  As the patent service statute "plainly assumes that the defendant will have a 'regular and established place of business' within the meaning of the venue statute only if the defendant also has an 'agent . . . engaged in conducting such business,'"  there must be an agent regularly present.  Here, the court cannot say that Rossetti has an employee or agent in this district on a regular or established basis.  Indeed, as Rossetti has only a periodic presence in this district, and has taken no steps to establish a permanent presence, it would be difficult to locate and identify a Rossetti employee at the NTC or within the Eastern District of New York to effect service.  This lack of a "permanent agency transacting the business" cuts against a finding that Rossetti's business in this district is established.

ii. *Morgan*

Just as Rossetti's business in the Eastern District of New York does not qualify as regular and established, Morgan's certainly does not.  Uni-Systems argues that Morgan's business

31

at the NTC is regular because Morgan employees traveled to the NTC roughly 60 times between March 2014 and June 2018.  (Opp. at 16.)  Uni-Systems seeks to average this out to amount to one visit a month, but unlike Rossetti's representative – who explicitly testified that its employees visited the NTC roughly once every two weeks – Morgan's visits were not stated as occurring with any regularity.  Rather, as the facts summarized above showed, Morgan visited only periodically, with the bulk of its visits concentrated during a single phase of each of two projects.  The sporadic nature of its visits weigh against a finding of regularity.

Again, however, the above dispute is immaterial because it is clear that Morgan's place of business in this district is not established.  *Cray* instructs that a place of business is not "regular and established" if it is carried on "temporarily, or for some special work or particular transaction."  *Cray* 871 F.3d at 1362-63.  Here, Morgan's work pertained to two transactions at the NTC campus, namely, the Ashe and Armstrong Retractable Roofs.  As in *Winterbottom*, even assuming that Morgan had established a place at the construction sites to assist in these projects, neither could be considered sufficiently permanent.[11]  *Winterbottom*, 283 F. 518.  Morgan's

---

[11] As with Rossetti, to the extent Uni-Systems would argue that Morgan's place of business was the completed stadia or the NTC as a whole, its presence

primary activities occurred in Ohio, and its conduct at the NTC was largely limited to observing the installation of the components, which was performed by Hunt or its subcontractors.

Uni-Systems again seeks to rely on contractual relationships to show permanence.  The court agrees with Morgan that the maintenance contract is beyond the scope of the court's analysis as it was effected *after* the commencement of this action.  *See* 8 Chisum on Patents § 21.02, Part 3 of 4, at 11 ("Thus events *after* the filing of the complaint cannot be relied upon (though they may provide the basis for refiling a complaint or possibly filing a supplemental complaint).")  Uni-Systems appears to argue that, although the contract post-dates commencement of this action, it remains germane to the analysis. Even if true, however, Morgan's quarterly maintenance during the U.S. Open would certainly fall closer to *Knapp* than to *Remington* on the spectrum set forth by *Cray*.

The court also notes that the character of Morgan's conduct further counsels against a finding that its place of business at the NTC is regular and established.  The *Google* panel considered whether installation of Google servers would constitute "regular and established" business.  949 F.3d at 1346.  The panel found that "installation activity does not

---

there would be only sporadic, and it would nonetheless not constitutes a place "of Morgan" as required by *Cray*.

constitute the conduct of a 'regular and established' business, since it is a one-time event for each server." *Id.*  Similarly, the *Google* panel considered whether maintenance activities would constitute regular business.  The panel concluded that "[m]aintaining equipment is meaningfully different from – as only ancillary to – the actual producing, storing, and furnishing to customers of what the business offers." *Id.* These holdings appeared to have turned, at least in part, on a finding that the installation and maintenance of servers was only ancillary to Google's business.

Although this case presents somewhat different facts than *Google*, the relevant considerations still apply.  Morgan was engaged to design and manufacture parts, which it delivered to the NTC for installation.  This installation, which Morgan merely observed, was a one-time process for each roof, and thus would not qualify as "regular."  Similarly, through Morgan's maintenance could arguably be considered more than ancillary to its business, the maintenance visits would not be regular enough to satisfy the second *Cray* requirement.  *See also, e.g.*, *Mantissa Corp. v. Great Am. Bancorp, Inc.*, No. 18-CV-2103, 2020 WL 1302513, at *4 (C.D. Ill. Mar. 18, 2020) (citing *Google* in rejecting proposition that conducting maintenance at bank's ATMs would constitute regular and established business); *Cellular Dynamics Int'l, Inc. v. Lonza Walkersville, Inc.*, No. 17-CV-

34

0027-SLC, 2017 WL 4046348, at *6 (W.D. Wis. Sept. 12, 2017)
("Neither sporadic, as-needed service calls nor periodic
maintenance visits amount to a 'permanent and continuous
presence.'").

      C. <u>Element Three: "Of the Defendant"</u>

      Although Uni-Systems failed to satisfy the foregoing
*Cray* requirement, the court will nonetheless consider the last
requirement – whether the place identified is a place of
business "of the defendant." *Cray*, 871 F.3d at 1362 (emphasis
added).  The defendant must "establish or ratify the place of
business." *Id.* at 1364.  The Federal Circuit set forth a number
of relevant considerations to assist the district courts in
their analyses, including whether the defendant:

- Owns or leases, or exercises other attributes of
  possession or control over, the identified place;

- Conditioned employment on an employee's continued
  residence in the district, or the storing of materials at
  a place in the district so they can be distributed or
  sold from that place;

- Represents it has a place of business in the district, or
  markets or advertises to the extent it indicates the
  defendant itself holds out a place for its business in
  the district; and

- Conducts similar activity at the identified place
  compared to the defendant's other places of business.

*Cray*, 871 F.3d at 1363-64.

      The parties dispute the relevance of these
considerations in the instant action.  Rossetti and Morgan focus

on the specific *Cray* considerations and argue they are not met. Uni-Systems, however, notes that *Cray* set forth these elements in the context of distinguishing the place of a defendant from the place of a defendant's *employee*.  Uni-Systems asserts that what the *Cray* factors really do is differentiate whether a defendant chose to do business at a particular place, or whether the defendant's employee happened to make that choice without the involvement of the defendant.  (Opp. at 20.)  Thus, Uni-Systems contends, the relevant inquiry should be whether the defendant committed to doing business at the place.

Courts have noted, however, that "[t]he analysis to be applied to a business location is similar to that applied to an employees' home office."  *Zaxcom, Inc. v. Lectrosonics, Inc.*, No. 17-CV-3408 (NGG) (SJB), 2019 WL 418860, at *7 (E.D.N.Y. Feb. 1, 2019).  A good example of this is *In re ZTE*, 890 F.3d 1008 (Fed. Cir. 2018), in which the defendant, ZTE (USA) Inc., had contracted with a third-party call center, iQor, to provide services.  *Id.* at 1015.  The defendant had "at least two full-time [ZTE] employees (supervisors) on site at the call center." *Id.*  The plaintiff argued that the call center constituted a place of ZTE, and the district court agreed.  The Federal Circuit vacated the district court's decision, explaining that:

> While the magistrate judge found that ZTE USA has at least two full-time employees (supervisors) on site at the call center, the determining factor is whether those employees

render the call center a place of the defendant, not solely
a place of the defendant's employees.

The magistrate judge did not consider whether ZTE USA
itself possesses, owns, leases, or rents the office space
for the call center or owns any of the equipment located
there.  The magistrate judge also made no findings as to
whether any signage on, about, or relating to the call
center associates the space as belonging to ZTE USA.
Finally, the magistrate judge did not make findings
regarding whether the location of the call center was
specified by ZTE USA or whether iQor would need permission
from ZTE USA to move its call center outside of the Eastern
District of Texas or to stop working for ZTE USA.

*Id.* at 1016 (internal quotation marks and brackets omitted).

The *ZTE* court thus confronted a situation where two of
the defendant's employees regularly conducted work at a third-
party facility.  The Federal Circuit indicated that the
determining factor was whether the presence of the defendant's
employees rendered the third-party location a place *of the
defendant*, not just a place of the defendant's employee.  The
Federal Circuit criticized the district court for not
considering *ZTE*'s connection with the call center, e.g., whether
ZTE owned, leased, or rented the office space of the call
center, rather than the mere presence of ZTE employees *at* the
call center.

*ZTE* instructs that this court cannot, and should not,
abandon the *Cray* considerations entirely in considering whether
Rossetti and/or Morgan ratified the NTC as their place of
business, or if the NTC was simply a place where their employees

37

serviced a particular customer.  *See also Automated Packaging Sys., Inc. v. Free-Flow Packaging Int'l, Inc.*, No. 14-CV-2022, 2018 WL 400326, at *10 (N.D. Ohio Jan. 12, 2018) ("At best, the facts merely show that there are several physical locations within this district where FPI employees occasionally carry 'on certain work for [their] employer.  That is not the same as Defendant having a regular and established place of business in this District.'" (quoting *BillingNetwork Patent, Inc. v. Modernizing Medicine, Inc.*, No. 17 C 5636, 2017 WL 5146008, at *3 (N.D. Ill. Nov. 6, 2017) (citing *Cray*, 871 F.3d at 1365))). The court will, thus, apply the *Cray* considerations, accounting, of course, for the unique circumstances of this action.

### i. *Rossetti*

Uni-Systems alleges in its Second Amended Complaint that Rossetti ratified the NTC as its place of business as follows: "Rossetti has ratified the National Tennis Center as its place of business by exercising control over sites during and after construction, both in practice, through approval and rejection of trade submittals, and contractually, through its right to access the sites as needed and its obligations to, inter alia, monitor work and perform on-site inspections."  (SAC ¶ 12.)  These allegations are patently insufficient and do nothing to change the court's previous finding that Uni-Systems'

38

allegations only showed that Rossetti provided services to a customer at *the customer's* place of business.

None of the *Cray* considerations counsels in favor of a finding that Rossetti has "ratified" the NTC as *Rossetti's* place of business, rather than that of its customers.  Rossetti did not own any part of the NTC.  Uni-Systems further asserts that Rossetti exercised "attributes" of control over the construction sites, but, at best, contends only that Rossetti had a modicum of control over the construction sites, and not the NTC campus as a whole.  *See* CONTROL, Black's Law Dictionary (11th ed. 2019) (defining "control" as "the power or authority to manage, direct, or oversee," and giving as an example, "the principal exercised control over the agent").  In contrast to Rossetti, the USTA owned the campus, decided when to conduct renovations, decided who to hire to work on projects, decided how to use the campus, and controlled full access to the campus and all operations.  Furthermore, Rossetti has no employees residing in this district, let alone any working regularly at the NTC, and did not condition any employment on one's willingness to periodically travel to the NTC.  Nor did Rossetti advertise the NTC as its place of business, list the NTC as such in any directory, or place the Rossetti name on a sign associated with any NTC building.  The construction sites and/or the NTC are

clearly places of USTA, and are merely places where Rossetti employees carried out work on behalf of their employer.

Cray indicated that "[a] further consideration for this requirement might be the nature and activity of the alleged place of business of the defendant in the district in comparison with that of other places of business of the defendant in other venues." Cray, 871 F.3d at 1364. The panel noted that the comparative nature of the defendant's activities in different venues would only be relevant to the extent it reveals the nature of the businesses used by the defendant. Id. ("[A] relative comparison of the nature and activity may reveal, for example, that a defendant has a business model whereby many employees' homes are used by the business as a place of business of the defendant."). Here, a comparison of Rossetti's operations makes clear the NTC is not a place of Rossetti's business. Rossetti was engaged to provide design services, and completed all design services in Detroit, conducted its review of trade submittals and various other obligations in Detroit, and housed all of its employees in Detroit. Rossetti employees visited the NTC to only attend local meetings and field visits. The NTC is not a "place of business" of Rossetti, but instead a place of Rossetti's customer.

Although, as the parties note, no court has ruled exclusively on whether a customer's location can constitute a

40

place of business of the defendant, this is not the first time
such facts are before a court.  Several courts have considered
and rejected, explicitly or implicitly, the notion that a
customer's location is equivalent to one of the defendant.  *See,
e.g.*, *Automated Packaging*, 2018 WL 400326, at *9 (N.D. Ohio Jan.
12, 2018) ("[S]ervicing a customer at the customer's facility
cannot transform that facility into the patent defendant's place
if the defendant does not hold such place out as its own.");
*Regents of the University of Minnesota v. Gilead Sciences, Inc.*,
299 F. Supp. 3d 1034, 1042 (D. Minn. 2017) ("While the Court
agrees [defendant's] employees service customers in Minnesota,
whether through visits to healthcare providers or clinical trial
facilities, this servicing occurs at the customer's physical
place, not [defendant's].");  *Niazi v. St. Jude Med. S.C., Inc.*,
No. 17-CV-183-JDP, 2017 WL 5159784, at *3 (W.D. Wis. Nov. 7,
2017) ("District courts that have applied § 1400(b) since *Cray*
have . . . concluded that servicing customers in a particular
district does not satisfy § 1400(b) — even if employees live in
the district — if the defendant 'does not hold out its
employees' homes as the company's places of business.'").

Uni-Systems, nevertheless, argues that Rossetti merely
must "commit to engage in business" from the place, and that
this commitment is evident from its contracts to do business at
the NTC.  But those contracts are just that – agreements to *do*

*business*, not to maintain a *place of business*.  One can engage
in business at a place that is not its own, as Rossetti did
here.  Reading the statute as Uni-Systems suggests would read
out any distinction between the "doing business" inquiry of the
general venue statute, 28 U.S.C. § 1391, and the "regular and
established place of business" inquiry of the patent venue
statute, 28 U.S.C. § 1400(b).  Ratifying a place of business as
one's own requires more than simply agreeing to do business at
the place, and the facts of this case do not support a finding
that Rossetti has ratified the NTC construction sites, or the
NTC campus in its entirety, as "its" place of business.

ii. *Morgan*

Uni-Systems alleges that Morgan "ratified the [NTC] as
its place[] of business by exercising control over the site
during construction, both in practice, through regulation and
supervision of safety conditions, and contractually, through its
obligations to, *inter alia*, protect and maintain all materials,
machinery, tools, equipment, and supplies on-site."  (SAC ¶ 14.)
Uni-Systems argues that Morgan "further ratified the [NTC] as
its place of business by exercising control over the retractable
roofs in the course of maintaining and inspecting the completed
roofs, and by providing trained employees to operate the roofs."
(*Id.*)  These arguments, again, are insufficient.

42

None of the *Cray* considerations suggests that Morgan ratified the NTC as its place of business.  Morgan does not own or lease any property in this district, let alone any part of the NTC.  Uni-Systems overstates its case in arguing that Morgan exercised attributes of control over the NTC or any part of it.  Morgan has no employees residing in this district, nor does Morgan distribute or sell any materials from storage places in this district.  To the extent Uni-Systems argues that Morgan conditions employment on employees' *presence* in this district, that argument is unavailing.  The relevant inquiry is whether the employer conditions the employees' employment on their *residence* – not presence – in this district.  Here, the presence of Morgan employees was "material" to the company's business, but there is no evidence that Morgan conditioned these employees' employment on residence in this district.  *See Regents*, 299 F. Supp. 3d at 1044.  Indeed, none of the Morgan employees resides here.  And Morgan does not advertise, market, or hold out to the public that it has a place of business in this district.

Furthermore, a comparison of Morgan's operations in Ohio with its conduct at the NTC makes abundantly clear that the NTC was not a place of Morgan's business at all.  Morgan was contracted to provide design, manufacture, commission, and installation supervisions services.  During the engineering and

43

manufacturing phase of each project, Morgan's activities were
limited to designing aspects of the roof and building
mechanization components, which occurred in Ohio.  Once that
work was completed, Morgan's role was limited to observing
installation, which was performed by Hunt or its subcontractors.
Morgan's observation and supervision services during
installation were incidental to its primary service, designing
and manufacturing parts for the retractable roofs.  *See Google*,
949 F.3d at 1346.[12]

     D. <u>Convenience and Fairness</u>

     Uni-Systems finally argues "the fairness and
convenience policies underlying the patent venue statute support
a determination that venue is proper as to both Morgan and
Rossetti."  (Opp. at 25.)  But as the cases Uni-System cites
make clear, venue requirements exist for the benefit of
defendants.  *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 84
F.3d 1408 (Fed. Cir. 1996).  *Denver & Rio Grande W.R.R. Co. v.
Bhd. Of R.R. Trainmen*, 387 U.S. 556 (1967), declined to allow an
unincorporated association to be sued in any jurisdiction in
which any of its members resided under § 1391 as "patently

---

[12] Uni-Systems also cites the fact that Morgan consented to venue in this
district under its contracts with Hunt and Hardesty & Hanover.  (Opp. at 23.)
Whether Morgan consented to venue in other contracts, which Uni-Systems
cannot enforce, or whether Morgan's objection to venue is "tactical" does not
make venue any more or less proper under the patent venue statute, which does
not expressly provide for contractual exceptions.

unfair *to the association* when it is remembered that venue is primarily a matter of convenience of litigants and witnesses." And *Leroy v. Great W. United Corp.*, 443 U.S. 173 (1979), recognized that "[i]n most instances, the purpose of statutorily specified venue is to *protect the defendant* against the risk that a plaintiff will select an unfair or inconvenient place of trial." *Id.* at 183-84 (emphasis added).

In any event, as the court indicated above, the patent venue statute is not to be liberally construed "in the interests of some overriding policy." *Schnell*, 365 U.S. at 262.  The Federal Circuit's decisions have made clear that courts are cautioned not to broadly read the venue statute. *See, e.g.*, *Google*, 949 F.3d at 1346 ("We reach our conclusion bearing in mind that, as we noted in Cray, the Supreme Court has cautioned against a broad reading of the venue statute.").  Thus, although the court is inclined to agree with Uni-Systems that it would be more convenient to address all claims in a single forum, the statute requires otherwise.

**IV.  Dismissal vs. Transfer**

"Pursuant to 28 U.S.C. § 1406(a), where, as here, venue is improper, the court must decide whether to dismiss the action, or, if it is in the interest of justice, to transfer the action to a venue 'in which it could have been brought.'" *NetSoc*, 2019 WL 4857340, at *5.  "This decision 'lies within the

45

sound discretion of the district court.'"  *Id.* (quoting *Blakely v. Lew*, 607 Fed. App'x 15, 18 (2d Cir. 2015)).  "Dismissal, as opposed to transfer, is advisable when the case is a 'sure loser.'"  *Id.* (quoting *Gonzalez v. Hasty*, 651 F.3d 318, 324 (2d Cir. 2011)).  Here, although the court has previously found that Uni-Systems' amended complaint only barely stated a claim against Rossetti and Morgan, it cannot conclude that Uni-Systems is so certain to lose that dismissal is warranted.

Accordingly, the court finds transfer to be in the interest of justice.  Although Uni-Systems does not address the possibility of transfer in its opposition, the Rossetti defendants request transfer to the Eastern District of Michigan, where Rossetti resides, and the Morgan defendants request transfer to the Northern District of Ohio, where Morgan resides. The court is reluctant to make a decision that will result in duplicative litigation, but "§ 1400(b) and the applicable case law unequivocally compel such a decision."  *Kohnstamm & Co., Inc. v. Allied Chem. Corp.*, No. 72 Civ. 301, 1974 WL 20206, at *4 (S.D.N.Y. Mar. 21, 1974); *see also Tour*, 377 F. Supp. 3d at 211 n.11; *Toombs v. Goss*, 768 F. Supp. 62, 62 (W.D.N.Y. 1991).

## Conclusion

For the foregoing reasons, Rossetti's motion to transfer is GRANTED.  The Clerk of Court is directed to sever Uni-Systems' claims against both Rossetti Inc. and Rossetti P.C.

from this action and transfer them to the Eastern District of Michigan.  Morgan's motion to transfer is also GRANTED.  The Clerk of Court is directed to sever Uni-Systems' claims against Morgan Engineering, Morgan Automation, and Morgan Kinetic and transfer them to the Northern District of Ohio.

**SO ORDERED.**

Dated:    April 7, 2020
          Brooklyn, New York

/s/
Hon. Kiyo A. Matsumoto
United States District Judge